UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

**Civil Action No. 15-81-HRW**

**BRYAN REEVES,**                                                                          **PLAINTIFF,**

**v.**                          <u>**MEMORANDUM OPINION AND ORDER**</u>

**CITY OF WEST LIBERTY, KENTUCKY,**
**and**
**JUSTIN FLANNERY,** *Individually,*
*and in his official capacity as*
*Police Officer for the City of West Liberty, Kentucky,*                    **DEFENDANTS.**


This matter is before the Court upon Defendants' Motion for Summary Judgment [Docket No. 28]. The motion has been fully briefed by the parties [Docket Nos. 28-1, 29 and 30]. For the reasons set forth herein, the Court finds that summary judgment is not appropriate as to any of Plaintiff's claims except for his claim for defamation.

I.

This case arises from Plaintiff Bryan Reeves' arrest for DUI. In his Complaint, Plaintiff states that on September 28, 2014, at about 12:02 a.m., that he, while operating his automobile, in a lawful and proper manner, was stopped by the Defendant, Justin Flannery, a police officer, employed by the City of West Liberty, Kentucky. After the Plaintiff's vehicle was stopped, Kentucky State Troopers also responded to the call. [Complaint, Docket No. 1-1, ¶ 3]. Plaintiff alleges that he was asked by the police officers to get out of the car, and perform field sobriety tests. Specifically, the Plaintiff submitted to, and passed, the eye nystagmus examination four (4) times, once for each of the Kentucky State Troopers, and twice for the Defendant Flannery.

Plaintiff informed Defendant Flannery that he had prior surgeries to his leg.   *Id*. at ¶ 4.
Defendant Flannery arrested for driving under the influence and took him into custody.  Plaintiff
was then transported to a local jail, where he underwent a strip search, including a body cavity
search *Id*.

Blood tests later revealed that Plaintiff did not have alcohol or other controlled substances
in his system and the charge was, ultimately, dismissed.   This lawsuit followed.

Plaintiff claims that Defendant Flannery arrested him without probable cause, thereby
violating his rights under the United States Constitution, and the Kentucky Constitution,
specifically the Fourth and Fifth Amendments to the United States Constitution, and Section 10
of the Kentucky Constitution.  Further, Plaintiff alleges that Defendant Flannery The police
officer, employed by the City of West Liberty, acted intentionally, while violating the Plaintiff's
constitutional rights, and did so knowingly, while acting under color of law, in  violation of 42
U.S.C. Section 1983.  In addition, Plaintiff alleges that a result, he suffered personal injury to his
body, including mental anguish, and physical, and mental pain and suffering, including physical,
and mental pain and suffering, reasonably likely to be incurred in the future, as well as
psychological injury inflicted upon the Plaintiff, for which treatment in the future is reasonably
likely. *Id*. at ¶ 7.  Finally, Plaintiff claims that subsequent to his arrest, an article appeared in the
local newspaper which stated that he had been arrested and listed the charge. *Id*. at ¶ 9.   He
claims this to be a basis for a claim of defamation against the Defendants.

Defendants seek judgment as a matter of law as to all claim alleged against them. In
addition to denying violation of either federal or state law, Defendants maintain they are entitled
to qualified immunity.

## II.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This Court will consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. *Id.* The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law. *Id.* at 251–52, 106 S.Ct. 2505.

## III.

This case hinges upon probable cause. Although "state law defines the offense for which an officer may arrest a person, ... federal law dictates whether probable cause existed for an arrest." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir.2011).   Probable cause for an arrest "quite familiarly, depends on 'whether, at the moment the arrest was made, ... the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.' " *United States v. Harness*, 453 F.3d 752, 754 (6th

3

Cir.2006) (*quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)).

Whether probable cause exists in a particular situation, however, is often difficult to determine.

The probable-cause standard is incapable of precise definition or quantification into percentages

because it deals with probabilities and depends on the totality of the circumstances. *See Illinois v.

Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  "The substance of all the

definitions of probable cause is a reasonable ground for belief of guilt and that the belief of guilt

must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*,

540 U.S. 366, 371, 1245 S.Ct. 795, 157 L.Ed.2d 769 (2003).  Generally, the existence of

probable cause in a § 1983 action presents a jury question, unless there is **only one** reasonable

determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995) (emphasis added).

In support of their motion and their argument that Defendant Flannery had adequate

probable cause upon which to arrest Plaintiff, Defendants present the deposition testimony of

Plaintiff, Defendant Flannery as well as two Kentucky State Troopers.  Defendants contend that

the deposition testimony tells a different tale than the one set forth in the Complaint.

Kentucky State Trooper Luke Goodwin testified that he first saw Plaintiff's vehicle as it

departed city limits of West Liberty on 519 and 7, where the two roads merge. [Deposition of

Luke Goodwin, Docket No. 26, p. 8].  He observed him  driving significantly below the speed

limit, failing to maintain his vehicle within their lane and running off the pavement, and crossing

the centerline into oncoming traffic while vehicles were passing in the opposite direction. *Id.*  He

believes he had probable  cause to activate his lights and stop Plaintiff.  However,  Trooper

Goodwin called  dispatch asking for another officer because he was transporting a passenger to

St. Claire Medical Center in Morehead and, this, was not authorized to conduct a traffic stop . *Id.*

The Kentucky State Police contacted the West Liberty Police Department

dispatch and advised them that Trooper Goodwin was behind a vehicle that was driving 35 in a

55 mile an hour zone, and that vehicle had run off the roadway four times, and the driver was

possibly under the influence, and requested an officer on duty come out to help. [ Deposition of

Justin Flannery, Docket No. 25, pp. 8-9 and Docket No. 26, p. 5]. Although Trooper Goodwin

initiated the stop, he remained in his vehicle with his blue lights on until, Defendant Flannery

arrived on the scene. [Docket No. 26, p. 9].

Defendant Flannery made contact with Plaintiff, and had a short conversation,

after which, he asked Plaintiff to exit his vehicle. [Docket No. 25, p.14]. Defendant Flannery

then conducted a standard field sobriety test, which consists of three different tests: the horizontal

gaze nystagmus test (HGN), walk-and-turn test, and the one-leg stand test. *Id.* at p. 17.

Defendant Flannery performed these all three tests himself, and testified that he observed five

out of a possible six clues for impairment of the horizontal gaze nystagmus and four clues of

impairment out of eight possible clues on the walk-and-turn test, to-wit, starting the test before

being instructed to start, misses' heel-to-toe, raises arms, and improper turn. *Id.* at p. 24.On the

one-leg stand test, he observed three clues of impairment, out of a possible four: sways, raises

arms, and puts foot down. *Id.* He also testified that Plaintiff had bloodshot eyes and appeared to

be confused. *Id* at p. 33. Based upon the foregoing, Defendant Flannery determined that Plaintiff

failed the field sobriety test. He then arrest Plaintiff. *Id.* Defendant Flannery testified that

he did not detect alcohol or drugs on Plaintiff or in his vehicle. *Id.* He also recalled that

Plaintiff told the police officer that he had surgeries, which prohibited him from successfully

completing the standard sobriety tests.

A second Kentucky State Trooper, Robert Martin arrived on the scene after the field sobriety test had been given. [Deposition of Robert Martin, Docket No. 27, p. 3]. Trooper Martin testified that he was on his way home to Pikeville when he had received the call from KSP dispatch that Trooper Goodwin believed he was behind a vehicle under the influence. *Id.* at p. 4. At the time he was 15 or 20 minutes away from the scene and went to assist. By the time Trooper Martin arrived, however, "they were finishing up." *Id.* at p. 8.

Plaintiff was deposed as well. He testified to that after pulling out from the parking lot across from the West Liberty entrance sign, where he had taken his girlfriend to, he was followed by a West Liberty Police officer for approximately seven-and a half-miles traveling toward Grayson, when he saw blue lights from that vehicle. [Deposition of Bryan Reeves, Docket No. 24, pp. 17-18]. He recalled traveling at 35 miles per hour in a 55 miles per hour zone, because his truck had a bad transmission, so it wouldn't pull the hill very well. He did not, however, recall running off the roadway. *Id.* at 18. Plaintiff testified that the steering can go in and out on that vehicle. *Id.* With regard to the traffic stop, he recalled there being two State Troopers and several officers performing the field sobriety tests. *Id.* at 20. He recalls one of the State Troopers stating, "[h]is pupillary response is fine, and he's not slurring his speech. *Id.* at 31.

This case represents a classic he said-he said dispute of facts. Indeed, the issue of probable cause is, almost always, rife with issues of fact and, thus, belong in the hands of a jury. The differing narratives of what happened the night of Plaintiff's arrest preclude a finding of "only one reasonable determination". Another officer, standing in Defendant Flannery's shoes, could have, reasonably, concluded there was no probable cause.

Defendants disagree.  They rely heavily upon the 6th Circuit's opinion in *Jolley v. Harvell*, 254 Fed.Appx. 483 (6th Cir. 2007).  Jolley was pulled over at 2:23 a.m. because he paused at a stop sign for 30 seconds for no apparent reason.  The officer claimed to have smelled marijuana during the stop and proceeded to administer several field sobriety tests, all of which were recorded on video.  Jolley performed well on most of the tests, but he failed to complete the one-leg-stand test.  He was then placed under arrest for driving while impaired and, after a subsequent test for drugs or alcohol revealed that he was sober during the stop, he brought suit against the arresting officer.   The District Court sustained the officer's motion for summary judgment.  The 6th Circuit affirmed, rejecting the argument that a reasonably prudent officer would not have made the same decision stating:

> We would be hard-pressed to conclude that no reasonably prudent
> officer would have made the same decision, especially when
> balanced against the potential consequences of an incorrect call
> had Jolley ultimately proven to be impaired. A drunk driver
> is a severe threat to the safety of others. Jolley's ultimate
> innocence is irrelevant.

*Id.* at 489 (internal citations omitted).

However, *Jolley*, is an unpublished, nonbinding case.   More importantly, it is factually distinguishable from the case at hand.  More analogous, and thus more instructive, is the 6th Circuit's opinion in *Green v. Throckmorton*, 681 F.3d 853 (6th Cir. 2012).

Catrena Green had traveled all day from her hometown in South Carolina to a fairground in an unfamiliar area of Ohio. *Id.* at 856. At approximately 10:30 in the evening, she drove to Walmart to purchase groceries. As she returned to the fairgrounds, the roads "were wet from a recent rain [making] visibility somewhat worse than normal." *Id.* In order to see better, she

turned on her high beam lights. However, she failed to switch to her low beam lights when she encountered oncoming traffic. Her failure to do so violated Ohio law. A police officer driving in the opposite direction witnessed Green's failure to dim her lights, turned around, and began following her. He then saw the plaintiff "briefly cross[ ] over a shoulder lane marker." *Id*. The officer thereafter commenced a traffic stop. After the officer approached the Green's car, the officer asked why the plaintiff had "brighted" and "blinded" him with her high beams. *Id.* at 857. She apologized and told the officer that she used the beams because it was dark, there were no street lights like there were in her hometown, and she was trying to drive carefully. As the officer spoke with the plaintiff, he "momentarily pointed his flashlight inside [Green's] vehicle" and "noticed that [her] pupils were constricted." *Id*. He regarded that constriction as "abnormal." *Id*. Green then tried to exit her car in order to retrieve her driver's license from her trunk. When she did so, she "either forgot to completely remove her seatbelt or became entangled in it." *Id*. At that point, the officer "commented that [Green] might want to take her seatbelt off" when attempting to exit the vehicle. *Id*. (internal punctuation omitted). Green was then able "to remove her seatbelt quickly and easily," and she exited her vehicle. *Id*. The officer then asked her if she had anything to drink or had taken any drugs or medications that evening. Green responded she had not. In addition, the officer "did not see or smell alcohol or drugs at any time during the stop," and he did not "notice anything suspicious" upon a preliminary search of the Green's car. *Id*. The officer nonetheless chose to administer several field sobriety tests. He first attempted to conduct the HGN Test using his pen as a stimulus. According to the officer, he tried to administer this test two times but was unable to complete the test because Green could not follow the tip of his pen as he moved it back and forth. The officer then asked the her again if she had

8

taken any drugs or medications.  She said she had only been drinking water. See id. The officer

did not  believe her and insisted that "[y]ou've taken something else. I mean, you're, you're just

completely dazed off there for a second." *Id*. The officer then tried to administer the

HGN Test a third time, and he concluded that Green again failed to follow the pen with her eyes.

The officer then asked her to "recite the alphabet, beginning with the letter L and ending with the

letter S." *Id*. He also asked her to "count backward from 57 to 42." *Id*. Green was able to

complete the Alphabet Test "without difficulty," but she "hesitated slightly between a few of the

numbers" during the counting test. *Id*. The officer also "noticed that she talked slowly and that

there was a slight slur to her words." *Id*.

    Next, the officer administered the One- Leg Stand Test. During the test, Green "struggled

to maintain her balance...but [she] did not sway badly." Id. In addition, "[h]er foot appear[ed] to

touch the ground on multiple occasions, and she skipped the number 19 while counting." *Id*.

    Finally, the officer administered the Walk and Turn Test. During this test, Green "swayed

very slightly as she walked, used her arms for balance, and turned right instead of left." *Id*. at

859.

    After these tests were complete, the officer once more attempted to administer the HGN

Test.  He again determined that Green could not follow his pen with her eyes, he arrested her for

"driving under the influence of alcohol or drugs." *Id*.

    Following her arrest, officers searched her car and found no evidence of drugs or alcohol.

Green was then transported to the police station and charged with operating a motor vehicle

while under the influence of drugs or alcohol. She was held in custody for two days while she

attempted to make bail. During her time in custody, she provided a urine sample to be tested for alcohol and drugs. "When [the plaintiff's] urine test later came back negative for both alcohol and drugs, all charges against her were dismissed." *Id.*

     Following the dismissal of the charges against her, Green sued the officer under 42 U.S.C. § 1983 for, among other things, arresting her without probable cause. The officer moved for summary judgment on the basis of qualified immunity. The United States District Court for the Southern District of Ohio, concluding that no constitutional violations had occurred, granted summary judgment in favor of [the defendant officer]." *Id.*

     The Sixth Circuit reversed, refusing to accept as undisputed the officer's testimony that the plaintiff's "pupils were constricted and that this feature suggested possible impairment." *Id.* at 862. The court noted that the video of the stop "provide[d] no evidence to support [the officer's] claim that [Green's] pupils were constricted at the time of the stop," and it stressed that the negative result of the urine test "alone is sufficient to cast doubt on the truthfulness of [the officer's] testimony regarding [her] pupils." *Id.* at 862-63. The court added that under these circumstances, it was unwilling to "take" the officer's testimony about the Green's pupils "on faith," and it declined to "penalize [Green] for failing to produce any evidence directly rebutting [the officer's] stated observation" concerning her pupils because she could not "speak to the appearance of her [own] pupils." *Id.* The Sixth Circuit then stressed that a reasonable juror could conclude that the plaintiff was neither confused nor disoriented. A reasonable jury could find, for example, that she acted rationally throughout the stop, that her relatively minor traffic violations were not indicative of impairment, and that [the officer's] fabricated the alleged

constriction of [her] pupils to create an after-the-fact justification for the detention. *Id.* at 864.

While the facts in *Green* are not identical to those here, there are a number of significant similarities between the two cases. In both cases, (1) the plaintiffs drove in an irregular manner; (2) the officers did not see or smell alcohol during the stop; (3) the drivers denied ingesting drugs or drinking alcohol; and (4) the officers found no evidence of drugs or alcohol in the drivers' vehicles. *Green* is clear: it is proper to consider to the facts and explanations tendered by the Reeves as to any purported deficiencies of his behavior, including any innocuous conditions that might explain any less than perfect performance on the tests.

Moreover, the deposition testimony provides alternate reasons, provided by Reeves, which would meet the criteria of innocuous conditions and explain driving 35 in a 55, and the driving irregularities noted by the police officer. Specifically, he testified in his deposition that the police officers followed him 7.8 miles before they pulled him over [Docket No. 24, p.35], that he had previously had knee surgery and then only earlier the same year of his arrest had suffered an ankle injury. *Id.* He disputed that he had ran off the road.

Given these conflicting facts, the undersigned cannot say, as a matter of law, that Defendant Flannery had probable cause upon which to arrest Plaintiff. As noted in *Green*, Plaintiff's behavior may give rise to a "hunch," and whether this "hunch" rose to the standard of probable cause is a question for the jury. *Green*, 681 F.3d at 863.

Having reached this conclusion, the question remains as to whether Defendant Flannery is entitled to summary judgment based on the defense of qualified immunity. Qualified immunity

is a doctrine that "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Supreme Court has made clear that "qualified immunity is an immunity from suit rather than a mere defense to liability." *Id.* at 231, 129 S.Ct. 808. On the other hand, "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir.2010). The question of qualified immunity in this case turns upon which version of the facts one accepts, and, as such, cannot be determined at this juncture. *See Kennedy v. City of Cincinnati*, 595 F.3d 327, 336–38 & n. 7 (6th Cir.2010) (internal quotation marks omitted) (denying qualified immunity at the summary-judgment stage because the reasonableness of the officer's conduct depended on disputed facts to be determined by the jury).

As for Plaintiff's claim of defamation, it is axiomatic that truth is an absolute defense to such a charge. Plaintiff was arrested and the arrest was allegedly published in the newspaper. The Newspaper reported that he had been arrested and listed the charges, which was true – he was arrested. Therefore, under state law no action for defamation can lie. *See Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. App.1981) (listing elements of offense to include defamatory language); see also *Bell v. Courier–Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. App.1966) (holding that truth is a complete defense to an action for libel). Therefore, this claim will not survive a summary judgment motion.

12

## IV.

Accordingly, **IT IS HEREBY ORDERED** that  Defendants' Motion for Summary

Judgment [Docket No. 28] be **SUSTAINED** as it pertains to Plaintiff;'s claim for defamation

and **OVERRULED** in all other respects.

This is an **INTERLOCUTORY** and **NON-APPEALABLE** Order.

This _29th_ day of November, 2016.



Signed By:
Henry R. Wilholt, Jr.
United States District Judge

13